RENDERED:  JULY 17, 2026; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2025-CA-0009-MR

TARA WOOD                                                          APPELLANT

v.
APPEAL FROM CAMPBELL FAMILY COURT
HONORABLE ABIGAIL E. VOELKER, JUDGE
ACTION NO. 16-CI-01002

JEREMY BRAGG                                                        APPELLEE

OPINION
AFFIRMING IN PART AND
VACATING AND REMANDING IN PART

** ** ** ** **

BEFORE: CETRULO, McNEILL, AND TAYLOR, JUDGES.

CETRULO, JUDGE:  Tara Wood ("Mother") appeals two orders of the Campbell

Family Court:  (1) the November 25, 2024 order requiring Mother's parenting time

to be temporarily supervised and for her to undergo a comprehensive psychological

evaluation and collateralized parenting assessment; and (2) the November 26, 2024

order directing Mother to pay fees of the guardian *ad litem* ("GAL").  After

review, we affirm the November 25 Order, but vacate the November 26 Order and remand for additional findings as to reasonableness.

## BACKGROUND

The parties, Mother and Jeremy Bragg ("Father"), have one minor child in common born in October 2014. Mother and Father were never married but lived together with the child until their relationship ended in 2016. In November 2016, Mother petitioned to establish paternity and for sole custody of the child. In August 2017, the parties agreed to joint legal custody, but that agreement appears to mark the beginning and the end of their accord.

For the next eight years, a disheartening pattern developed. Mother repeatedly asserted the child would refuse to go willingly with Father at the parenting time exchanges. After each failed exchange, Father moved to hold Mother in contempt for not abiding by the court-ordered parenting time exchange mandates. Mother would accuse Father of poor parenting, and Father would deny those claims and argue Mother was actively working to alienate him from his child.[1]

---

[1] According to an April 2018 family court order (awarding Father increased temporary unsupervised parenting time), Mother argued against increasing Father's parenting time due to alleged poor parenting incidents she witnessed: (a) Father took a 5¢ toy from the child; (b) Father did "wheelies" while the child was in the stroller; (c) Father tossed the child in the air; and (d) a few occasions when the child returned from Father's care with diaper rash. There was an additional incident when Father allegedly took a picture of the child while Mother was changing his diaper, and Mother asserted this amounted to child pornography. The family court determined these incidents were "playful" and/or "benign in nature."

As the years went on, the accusations of poor parenting became accusations of abuse. On numerous occasions, during Mother's parenting time, the child would make an accusation of abuse against Father, an accusation Mother would bring before the family court. Father's parenting time would then be halted and/or supervised. An investigation would ensue, and the abuse claim would be found unsubstantiated.[2] Mother would then argue the investigation was flawed and/or limited (by state lines), and Father would accuse Mother of coaching the child into false accusations. Eventually, Father began to argue Mother was mentally unstable and engaging in a "systematic campaign to alienate [him] from [their] son." Mother denied those claims and asserted Father was "an abuser who maintains a façade of decency."

We need not discuss the plethora of pleadings, the more than 40 court orders (including more than 30 docket sheet orders), and more than 30 hearings that were included in the record by the end of 2024. We shall relay only those litigious elements necessary to convey the spirit of the litigation and/or the legal aspects specifically relevant to this appeal.

---

[2] Investigative bodies included law enforcement (in both Ohio and/or Kentucky), Kentucky's Cabinet for Health and Family Services ("Cabinet"), Northern Kentucky's Child Advocacy Center ("CAC"), and the Mayerson Center for Safe and Healthy Children at Cincinnati Children's Hospital.

Sometime in 2017, when the child was approximately three years old, he began "play therapy" with therapist Karen Carlson ("Therapist Karen"). It is unclear from the record how long that therapeutic relationship lasted. From our review, Therapist Karen is not mentioned again in records for years, but she is discussed briefly in the events leading up to and within the orders on appeal.

In March 2018, the family court ordered the parties to participate in a custody evaluation by Jean Deters, Psy.D. This order did not specify if the custody evaluation should/would include mental health assessments for the parties, and it is unclear if Dr. Deters completed a full mental health evaluation for either parent in the process of completing this parenting plan. In a January 2019 status hearing, Father's legal counsel informed the family court that the parties – with Dr. Deters's assistance – had developed a "very exhaustive shared parenting plan" that resolved all pending issues except child support. While Dr. Deters's name does not appear on the tendered document, a 23-page parenting plan was entered into the record by agreed order in April 2019 ("2019 Parenting Plan"). This 2019 Parenting Plan recommended 50/50 custody and 50/50 parenting time with the condition that both parents complied with treatment recommendations.[3] Shortly thereafter, both parties began accusing the other of violating the plan.

---

[3] Dr. Deters recommended ongoing child-parent relationship therapy (for both parents to attend individually with the child) *and* individual therapy for both parents.

In February 2019, the family court appointed a Friend of the Court ("FOC"), and in November 2019, the court appointed a Parenting Coordinator. In March 2021, Mother moved for the appointment of a GAL, and the court did so. Despite these intermediaries, custodial complications continued.[4]

In December 2021, after more accusations of abuse, Mother moved for an order compelling both parents to undergo a parenting evaluation. At a subsequent hearing, Father stated he was "fine" with the child and parents receiving mental health evaluations. Orally and on a docket sheet, the family court ordered a psychological evaluation for "everyone involved." Shortly thereafter, the family court entered an order requiring (1) parenting time for both Mother and Father to be supervised by an unrelated third party; (2) the child to undergo a psychiatric evaluation by Cincinnati Children's Hospital; and (3) the parties to undergo a custodial evaluation. By agreed order in January 2022, the parties agreed to undergo a custodial evaluation to be performed by Dr. Feinberg which evaluation "shall include a psychological evaluation of all parties involved."

---

[4] For instance, at a December 2021 hearing, Mother asserted the child had made a new accusation of abuse against Father and again moved to have his parenting time suspended. Father denied the claim and argued this was merely yet another attempt to alienate Father from his child. During the hearing, the FOC stated his concern that the child's story seemed "coached." Also, the GAL stated at the hearing she had a private conversation with the child, but the child did not disclose this new incident of abuse to her during the conversation. Both the FOC and GAL stated their concern in Mother's delay in reporting the abuse (if she believed that abuse occurred). The Cabinet stated the child reported abuse, but that claim was later found to be unsubstantiated.

In February 2022, the family court allowed Mother and Father to resume joint custody and parenting time, and instructed the parties to exercise parenting time with a week on, week off schedule. In May 2022, per Mother's request, the court ordered the child to begin counseling with Teresa Izquierdo, Psy.D.

In October 2022, Father moved to suspend Mother's parenting time and petitioned for Mother to undergo a psychiatric evaluation. In this motion, Father asserted, in part, that Mother "either intentionally engag[ed] in the repeated pattern of interfering with [Father's] parenting time, or [Mother] suffers from undiagnosed, and thereby untreated psychiatric issues." He asserted that beginning in March 2016 through January 2022, Mother withheld parenting time and contact with the child from Father for 1,144 days, approximately 45% of the child's life. Father claimed Mother "engaged in a continual campaign to alienate and estrange the relationship" between Father and child.

Mother moved in kind, requesting the family court suspend Father's parenting time. Mother again asserted the child claimed Father abused him, including "punching him in the penis." Mother asserted that Father refused to take child to his appointments with Dr. Feinberg when they occurred "on his time," resulting in a several month delay in completing the custody evaluation.

In November 2022, the parties argued their dueling motions to suspend the other parent's parenting time. Mother requested the appointment of an

independent private investigator who could cross state lines and a new therapist for the child. Father opposed Mother's proposed investigator and did not want to change the child's therapist, a therapist initially requested by Mother.

The GAL stated the parties needed professional medical help to figure out what was going on with this family, but stated:

> My concern is that [Mother] will continue to do some of the things that she's been doing that are cause of concern for us [GAL and FOC], not taking [the child] to school, talking about the physical abuse that was just found to be unsubstantiated in Ohio. . . . My concern is whether it is even going to help if this therapist gives [Mother] something to do or something that she is not to do. I don't trust that she is going to do or not going to do what is recommended.

After arguments, the court stated:

> We've had investigation after investigation and there's been nothing that's been substantiated, right? There's not been any one substantiation as to what's going on here, what [Mother is] claiming, that the child's being abused by his father.

Ultimately, the family court set a status hearing two weeks out, did not appoint an investigator, and instructed the parties to follow the shared parenting plan (including Father receiving his parenting time that evening) and to continue with the child's therapist, Dr. Izquierdo. However, Mother did not bring the child to the exchange that evening, and Father moved the court to suspend Mother's parenting time due to concerns about her mental health and the effects on the child.

In December 2022, the family court again ordered the parties to exchange as mandated in the parenting plan, and, to ensure compliance, tasked two non-relatives to assist the exchanges by transporting the child. The court instructed Mother and her mother to *not* participate in the exchange if complications arise.

At the end of 2022, the family court judge, the Honorable Richard Woeste, retired. A new family court judge, the Honorable Abigail Voelker, presided over the matter beginning in January 2023. At a status hearing in January 2023, the family court requested the FOC's assistance in understanding the parties' ability to work with each other, to which the FOC replied, "In my 24 years of practice this is one of the worst cases I've ever seen." The FOC reiterated Father's statement that numerous medical professionals had been utilized, as well as numerous attempts at alternative dispute resolution, but problems and difficulties remained. The parties agreed that Dr. Feinberg was in the process of conducting a custodial evaluation. The court set the matter for trial, but the failed exchanges continued.

In March 2023, the family court entered a document into the record under seal, prepared by Dr. Feinberg. This Court has reviewed the document, but – observing the parties' privacy – we shall not disclose the contents in full. However, we must nonetheless relay certain, specific details.

First, the document states it "should not be considered a comprehensive custodial report" but was only a "summary" of a conference held with all the parties and Dr. Feinberg on March 10, 2023 ("Conference Summary").[5] The Conference Summary conveyed that the parents completed some psychological testing, but it is unclear to this Court if that testing was considered "comprehensive." According to the summary, Mother engaged in the testing twice because in the first attempt, "she displayed such a defensive approach, that it resulted in data with very limited clinical utility." The Conference Summary contained Dr. Feinberg's conclusions and recommendations, but did not detail the testing methodology.

Relevantly, the Conference Summary stated that "[i]t is evident that both parents love [the child] and are dedicated in their roles as parents[,]" but that the parties "needed close monitoring with ongoing intervention by a mental health professional due to the hostile environment they are creating for [their child.]" Dr. Feinberg asserted that the "dysfunction in the co-parenting relationship between [Father] and [Mother] is chronic and severe[,]" and both parents "continue to place [their child] at risk for long term psychological harm." Dr. Feinberg recommended *both parents* participate in individual therapy on a frequent, long-term basis from a board-certified psychiatrist.

---

[5] At that time, a complete custodial evaluation still required an additional four months and $2,000.

The Conference Summary determined **both parents** exposed the child to extraordinary co-parenting discord, but that the child "appears to have positive intact parent-child attachment to both of his parents." Dr. Feinberg stated **both parents** "place intolerable pressure on [the child] by their persistent and chronic fighting. [The child] is not free to love both his parents. He feels much pressure to join Mom and grandmother in hating and fearing [Father]. . . . However, he still wants to spend time with his father." Dr. Feinberg emphasized that for the child's health and well-being, the parents needed to cease "all this negative energy" and commit to providing a safe affirming environment for their child.

Despite Dr. Feinberg's statements as to the detrimental long-term effects for their child, Mother and Father were unable to implement a change in their behavior, and the toxic cycle continued. In December 2023, the family court entered an agreed order appointing a new parenting coordinator and vacated the existing trial date to allow more time for the parenting coordinator to prepare.[6]

Once again on August 4, 2024, Mother did not follow exchange procedures, and Father did not receive his parenting time. At the time of the most recent failed exchange, the procedure established by the family court was that the parent currently exercising parenting-time would arrive at a specific park 15 minutes prior to the exchange. That parent would then have the child play on the

---

[6] It is unclear how much involvement the prior parenting coordinator had in the matter.

park playground, and when the picking-up parent arrived, the dropping-off parent would get in his/her car and leave without confrontation. According to later testimony, on August 4, Mother was late arriving at the park, and instead of driving through the park entrance, she entered the adjacent police parking lot where the child exited the vehicle, used a phone to call for police assistance, and the child told an officer that he did not want to go with his father that day because of past abuse. The police officer informed Mother she could leave with the child. The police did not make a report or an arrest.

Two days later, on August 6, Father filed motions for contempt, for Mother's parenting time to be supervised, and for attorney fees. Father argued that for the 20th time since the inception of the action, Mother interfered with his court-ordered parenting time by repeating unsubstantiated claims.

Five days later, on August 11, the GAL filed a motion requesting (a) Father be granted parenting to make up for the time Mother most recently withheld; (b) an order modifying the current parenting schedule; (c) an order requiring Mother to undergo a comprehensive psychological evaluation; and (d) that Mother's parenting time be temporarily supervised. The GAL stated these requests were in the child's best interest and made "in an effort to protect the child's mental and emotional safety." On August 12, the family court considered the GAL's August 11 motion and set the matter for a hearing on August 21. In the

meantime, the court ordered "father shall have two weeks of consecutive parenting time (starting today)."

On August 20, Mother moved to strike Father's August 6 motion and GAL's August 11 motion, and requested the court discharge the GAL. Mother asserted that the GAL exceeded her authority by acting as a *de facto* FOC, and therefore was subject to cross-examination and disclosure of her files to the parties. As such, Mother attempted to subpoena the GAL and her files via email, service the GAL did not accept. That same day, Mother also moved to prohibit Dr. Izquierdo from testifying as an expert at the August 21 hearing.

Also on August 20, the GAL – through her own legal counsel – moved to quash Mother's email subpoena and responded to Mother's motion to strike/discharge her from the case. She asserted that as the child's legal representative, she merely advocated for the child's best interest and all her files were protected by attorney-client privilege. Additionally, the GAL argued Mother's motion was procedurally improper and "likely [] not filed in good faith."

On August 21, the family court held an almost three-hour hearing wherein Mother and the child testified. Also, the court entered into the record the body camera footage from the police officer present at the failed August 4 exchange. At the beginning of the hearing, after oral arguments, the family court denied Mother's motions but reserved on those motions by the GAL and Father.

Mother testified as to the events of August 4 and stated the child got out of the car and instigated the police contact on his own volition. She stated she tried to get the child to the exchange, but the child was resistant and fearful. She stated she was attempting to follow court orders, do what was best for her child, and adhere to the police officer's guidance.

The family court spoke to the child in chambers with only the GAL present, but a live video feed of the interview was projected in the courtroom for all parties to view. Legal counsel for both parties were permitted to send back questions for the court to ask the child during his testimony. The child testified that he knew the difference between the truth and a lie and admitted to telling Dr. Izquierdo different things depending on which parent was with him at that time. The child stated he loved both of his parents, but he was scared of his dad.

Specifically, the child relayed an incident of abuse: he was lying on his father's bed alone watching television when, with no interaction or provocation, his father walked into the bedroom and punched him in the penis and then walked out again without saying anything. Besides that incident, the court asked the child to describe another time his father had hit him. The child said he did not remember another specific incident of abuse, but "all I know that he's done it before." The court asked if the times Father hit him occurred when the child was "in trouble" and/or when his dad raised his voice, but the child said "no." After

more questioning, the child testified that previous times of abuse were consistent to the incident relayed, wherein Father walks into a room, hits him, then walks out.

The child stated he was close with his mom and he is sad when leaving her house. The child stated his mom dislikes his dad. The GAL asked the child if he remembered telling Dr. Izquierdo the day prior that his father had never hit him; the child admitted to saying that, but stated he only told the doctor that because his father was in the room that day. The GAL asked the child if he remembered telling Dr. Izquierdo that he only said his father hit him because he wanted to stay with his sister (mother's other child) that day; the child acknowledged making that statement to Dr. Izquierdo.

After the child's interview, the family court took a short recess. The remainder of the hearing was not included in the record on appeal. However, according to Mother's appellate brief, at that point the parties agreed to supervised parenting time to prevent the child's removal. The court ordered an investigation by the Cabinet and scheduled a case management conference for October 10, 2024.

At the conference hearing on October 10, 2024, numerous motions remained unresolved. We will discuss only those pertinent to this appeal.[7] At the

---

[7] By the time of this conference, Mother had filed seven new motions. In broad terms, Mother's motions (1) challenged the GAL's August 11 motion and her role, and requested the GAL be discharged; (2) requested discharge of the FOC and an order preventing him from testifying; (3) again sought Dr. Izquierdo's medical records; and (4) moved for the Cabinet to approve the parties' supervisors. Additionally, the GAL moved the court to quash Mother's subpoena of Dr. Izquierdo's medical records.

beginning of the hearing, Father's counsel summarized the pertinent case status. In his recitation, Father's counsel stated that the court previously ordered both parents be supervised during their parenting time due to the child's allegations of abuse. However, since that time, the CAC interviewed the child, and the Cabinet filed a report. According to Father's counsel, the Cabinet report stated the child did not make any abuse disclosures during the CAC interview. Father's counsel stated the child's fluctuating stories were "par for the course in this case. Sometimes he says something, other times he doesn't." There were no objections, and the parties appeared to agree as to what that report stated. Mother's counsel stated her understanding that the Cabinet's investigation was complete, implied no abuse was reported, and Mother's counsel informed the court of her intention to have the CAC interview with the child admitted into the record. We could not locate that interview in the record, nor a motion to have either admitted.

At the hearing, despite Mother recently moving to have the GAL and FOC discharged, Mother now asserted the family court needed to appoint additional professionals to protect the child, including a new therapist for the child. Father argued that the child was actively protected by numerous professionals – school employees, Dr. Izquierdo, GAL, FOC – but when those professionals challenged the child's veracity or made recommendations inconsistent with Mother's wishes, she sought their removal and replacement.

-15-

On the docket sheet from October 10, 2024, the family court typed a reiteration of its oral findings: (1) permitting parties to resume unsupervised contact with the child; (2) noting the withdrawal of the GAL's motion; (3) denying Mother's motion to review the GAL file as moot; (4) granting the GAL's motion to quash the subpoena for Dr. Izquierdo's records; (5) denying all motions pertaining to FOC records; and (6) dismissing the FOC from the case.

*The next day*, on October 11, a Friday, the GAL filed an *ex parte* emergency motion ("October 11 Emergency Motion") requesting: (1) Father be granted sole custody; (2) Mother be ordered to undergo a comprehensive psychological evaluation; and (3) Mother's parenting time be halted or supervised. Importantly, the family court determined it was premature for a custodial determination and limited the GAL's October 11 Emergency Motion to a request for emergency injunctive relief, *i.e.*, *only* a request for a psychological evaluation and change in Mother's parenting time and supervision.

In the October 11 Emergency Motion, the GAL asserted that after the previous day's hearing, Mother picked the child up from school and drove him to Dr. Izquierdo's office for a visit. Immediately upon entering Dr. Izquierdo's office, the child began to have a "total melt down" and began throwing chairs, yelling, and cussing. The GAL stated that Mother did not attempt to de-escalate the situation but instead began filming the incident and suggesting Dr. Izquierdo

-16-

call Therapist Karen, the child's therapist from 2017. The motion stated that Dr. Izquierdo was able to calm down the child, but the child did not attend his therapy session that day. That same day, October 11, the family court entered an order temporarily suspending Mother's parenting time and scheduling a hearing for the following Monday morning, October 14.

On October 14, the family court began a full hearing on the GAL's October 11 Emergency Motion and the court's October 11 order suspending Mother's parenting time. The hearing took place over three days: October 14, November 15, and November 25.[8] The family court allowed Mother to play an audio recording she made on October 10, and heard testimony from the director of the after-school program attended by the child, a post-doctoral intern from Dr. Izquierdo's office, Dr. Izquierdo, and Mother.

The director of the after-school program was not present for the child's meltdown at Dr. Izquierdo's office but relayed a prior outburst where the child cussed, kicked at objects, and was difficult to calm. This incident likewise occurred during Mother's parenting time.

The post-doctoral intern testified that she was present when the child arrived at Dr. Izquierdo's office on October 10. The intern stated that immediately

---

[8] The family court allowed Mother to resume parenting time, albeit supervised in a clinical setting, while the hearing was pending. Mother continued filing motions during that timeframe but again, we focus our factual recitation on those dispositive issues alone.

upon entering Dr. Izquierdo's office, the child began flipping the chairs in the lobby, stomping on the chairs, yelling, and cussing. Dr. Izquierdo entered the lobby and attempted to calm the child. While Dr. Izquierdo attempted to calm the child, Mother repeatedly stated that the child wanted to see Therapist Karen. Eventually, the child went outside, got into his mother's car, and Dr. Izquierdo and Mother followed him. While the intern had seen the child on previous occasions, this incident was the first time she actually interacted with Mother or child. To her knowledge, since May, Father brought the child to therapy appointments with Dr. Izquierdo. When Father arrived with child, the child normally "seems to be really happy, and relaxed, and kinda joking with dad."

The parties agreed that Dr. Izquierdo was a licensed clinical psychologist and the child's long-term therapist, but Mother objected to Dr. Izquierdo testifying as an expert witness due to the lack of notice and report. The family court proceeded on the understanding that Dr. Izquierdo would testify *only* as to her observations and interactions on October 10 and would refrain from making broader custodial recommendations or mental health conclusions.

Dr. Izquierdo stated she had been treating the child since November 2022 and had seen him consistently since that time, mostly on a weekly basis. Dr. Izquierdo testified that on October 10, the child was "extremely angry" upon arriving at her office and immediately began flipping and damaging the waiting

room office chairs. Dr. Izquierdo stated that early in their interactions, the child had been angry and cussed during prior appointments with Mother, but never to this degree. She stated that on October 10 she repeatedly tried to calm the child, but his anger continued to escalate. Dr. Izquierdo stated that while she was attempting to calm the child, Mother repeatedly asked if the child could speak with Therapist Karen. Dr. Izquierdo stated she was confused as to why Mother kept requesting the child's previous therapist in that moment. Dr. Izquierdo stated she had concern that Mother's comments appeared to escalate the child's anger. Specifically, on that day, Dr. Izquierdo stated she was concerned about the child's behavior due to the significant shift in his behavior and anger as compared to the week prior when he arrived with his Father.[9]

Mother testified that on October 10, her son became angry when she informed him of his appointment with Dr. Izquierdo. She stated she started recording in the car on the way in order to demonstrate her attempts at calming her child. Mother stated that on October 10 she was trying to make her child feel heard and reassured, and encouraged him to speak honestly and freely. Mother

---

[9] After Dr. Izquierdo's testimony, Mother filed a complaint against her with the State Board of Psychology, a complaint she refused to share with the other parties. The GAL later asserted that due to Mother's board complaint, Dr. Izquierdo had stopped treating the child. However, the GAL stated that stopping treatment with Dr. Izquierdo was not in the best interest of the child and informed the court that Dr. Izquierdo would be comfortable resuming therapy if the family court so ordered. On November 15, the court reiterated that its prior order appointing Dr. Izquierdo as the child's therapist remained in effect, and Dr. Izquierdo resumed treating the child.

testified that she kept mentioning Therapist Karen on October 10 because her child had recently begun requesting her. Mother stated she did not believe she was coaching her child. To the contrary, she claimed to be open to receiving parenting advice from anyone willing to give it. When asked if there was anything she would have done differently, she stated she should have called Father to inform him about what happened at Dr. Izquierdo's office.

The court denied Mother's request to call the child to testify again as such would not be in the best interests of the child and would not likely assist the court. The court stated it had previously spoken with the child and currently had cause to doubt his credibility, competency, and veracity.

On November 25, 2024, the family court entered a three-page typed docket sheet order explicitly incorporating its oral statements, the audio recording played in court, and the entire case file ("November 25 Order"). In this November 25 Order, the family court ordered Mother's parenting time be supervised in a clinical setting, and for Mother to undergo a "full" psychological assessment and collateralized parenting assessment.

Pertaining to the family court's denial of Mother's request to call the child to testify, the November 25 Order stated:

> The testimony of the child would offer nothing in assisting
> the Court in determining his best interests. This court has
> had countless hearings, has previously spoken with the
> child, and has reviewed the ongoing facts of this case

multiple time[s]. Frankly, it is the position of the Court that it must protect this child from the attempts to interview him. The child has met with numerous professionals, attorneys, CAC investigators, and Cabinet workers. The child is squarely placed between the interests of his parents. The [Court of Appeals] has stated: "The elementary principles of humanitarianism are so strongly against the placing of a child between its parents that we feel a trial court should have a wide latitude in protecting the child." *Parker v. Parker*, 467 S.W.2d 595, 597 (Ky. 1971). The Court believes this is the reason the decision to allow a child to testify has been left in the sound discretion of the [family court]. Notwithstanding the [family court's] adamant refusal to permit the child to testify as it would be damaging to him, the Court will further add that the competency of the child is in question, as the child has made conflicting statements to the Court, Cabinet, Therapist, and CAC. The Court questions if the child even knows the truth at this point.

Next, the family court denied Mother's motion to set aside the GAL's October 11 Emergency Motion on procedural grounds. The court determined the GAL's motion was verified and stated sufficient grounds for injunctive relief citing Kentucky's FCRPP[10] 2(8) and CR[11] 65.04.

Additionally, the family court discussed the testimony regarding the events of October 10.

Court listened to recording of Mother's drive with the child to [Dr. Izquierdo]. Throughout the drive, it was apparent the Mother wanted the child to continue to feel emotions, instead of helping and encouraging him. It

---

[10] Kentucky Family Court Rule of Procedure and Practice.

[11] Kentucky Rule of Civil Procedure.

-21-

showed a clear lack of insight. Even when the child had stopped talking about going, she would raise the issue again. Also, she keeps bringing up an old therapist. This is quite odd, given he has seen [Dr. Izquierdo] for a long time. EX: ["]You can tell her your dad blames me for everything and that upsets you.["] Continually asks what[']s wrong so she can help. It's like picking at a scab and never letting it heal. . . . Court understands the importance of validating feelings, but not contributing to them.

. . .

Court observes an intentional motive [by] Mother to avoid answering questions [of] counsel [on cross] and attempts . . . to skew answers and mislead the Court.

. . .

Court also sees that Mother has now constructed a story as to [Dr. Izquierdo], seemingly villainizes [Dr. Izquierdo]. Mother is desperately trying to show that [Dr. Izquierdo] was threatening and violent with the child, which is contrary to what the Court heard in the recording or observed during [Dr. Izquierdo's] testimony.

. . .

Mother continuously tries to discredit any professionals who have tried to help.

. . .

[T]he Court clearly finds the GAL *is* protecting the child. Mother is just not happy with the help that is given for the child, because the help given is addressing her poor parenting, not Father's.

Ultimately, the family court ordered Mother's parenting time be supervised in a clinical setting until she completes a comprehensive mental health evaluation. More specifically, the November 25 Order stated:

> Pursuant to KRS[12] 403.320(3), which states in pertinent part, "the [c]ourt shall not restrict a parent's visitation rights unless it finds that the visitation would endanger seriously the child's physical, mental, moral, or emotional health." [T]he Court finds unsupervised parenting time between Mother and child is of great risk to the child. On the date the Court lifted supervision of the parents' parenting time, a significant incident occurred that showed grave concern for the child's mental health. This Court is concerned with why the child is behaving in such [an] extreme manner when with the Mother. . . . Based on the testimony, combined with the history of this case, the Court finds parenting time/visitation with Mother endangers seriously the child's mental and emotional health. Even if Mother's testimony regarding her hope to work together [with Father] and assist the child with his mental health is taken to be fully true and credible, the concern remains that the child is having significant behaviors and demonstrating mental health concerns while with her. It is in the best interest of the child that the contact be supervised by a neutral, third party. Mother shall submit to a full psychological assessment and Collateralized Parenting Assessment. The Court reserves on the Motion for Modification of Custody.

The next day, on November 26, 2024, the court entered an order requiring Mother to pay GAL fees ("November 26 Order"). Mother appealed the November 25 Order and the November 26 Order.

---

[12] Kentucky Revised Statute.

## STANDARD OF REVIEW

Here, the parties worked with Dr. Deters to create the comprehensive 2019 Parenting Plan. However, this 2019 Parenting Plan was temporarily modified numerous times throughout the following years due to claims of abuse, missed exchanges, professional recommendations, accommodations for holiday/vacation schedules, and the parents' general inability to follow the plan and co-parent effectively. Such modifications are permissible.

A family court "may modify an order granting or denying visitation rights whenever modification would serve the best interests of the child; but the court shall not restrict a parent's visitation rights unless it finds that the visitation would endanger seriously the child's physical, mental, moral, or emotional health." KRS 403.320(3); *see also Layman v. Bohanon*, 599 S.W.3d 423, 429 (Ky. 2020) ("KRS 403.320(3) governs the modification of visitation."). "[T]he term 'restrict' means to provide [either] parent with something less than 'reasonable visitation[,]'" but a family court may "only order a 'less than reasonable' timesharing arrangement if the child's health is seriously endangered." *Layman*, 599 S.W.3d at 429 (quoting *French v. French*, 581 S.W.3d 45, 50 (Ky. App. 2019)). "There is no set formula for determining whether a modified timesharing arrangement is reasonable; rather, it is a matter that must be decided based upon the unique circumstances of each case." *Id.* at 432 (citation omitted).

A visitation/timesharing/parenting time modification must be left to the sound discretion of the family court. *Pennington v. Marcum*, 266 S.W.3d 759, 769 (Ky. 2008).[13] We review a parenting-time modification for abuse of discretion, though we review the family court's factual findings for clear error and its interpretation and application of statutes *de novo*. *Turner v. Turner*, 672 S.W.3d 43, 50-51 (Ky. App. 2023) (citations omitted). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000) (citing *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999)). Findings of fact are clearly erroneous if not supported by substantial evidence, and we must give due regard to the family court's opportunity to assess witness credibility and weigh the evidence. *Turner*, 672 S.W.3d at 54 (citations omitted).

"While standard of review is often perceived as boilerplate legalese, it should not be overlooked. . . . [I]t is the standard of review that acts as our cipher." *S.H. v. Cabinet for Health & Fam. Servs.*, 717 S.W.3d 749, 753 (Ky. App. 2025). These words are particularly relevant here as Mother's appellate briefs allege

---

[13] The terms "visitation" and "timesharing" are often used interchangeably. *Layman*, 599 S.W.3d at 429 (citation omitted); *but see Pennington*, 266 S.W.3d at 764-65 (recognizing the overlapping use, but stating "visitation" is **not** the most accurate legal term for a **joint** custodian's time with his/her children).

numerous due process violations, but fail to specifically address her appellate

burden, *i.e.*, Mother fails to show how the family court's orders were an abuse of

discretion, relied upon clearly erroneous factual findings, or erred in interpreting

and applying law.[14] Additionally, Mother fails to direct us to any precedent

wherein similar alleged due process violations were sufficient to establish the

family court abused its discretion by modifying parenting time. Simply, Mother

did not see the forest for the trees.

## ANALYSIS

On appeal, Mother mainly challenges the November 25 Order

modifying parenting time, but also contests the November 26 Order requiring her

to pay GAL fees.[15] We shall address each in turn.

### A. November 25 Order

In the November 25 Order, the family court, after hearing testimony

on three different days, modified parenting time – by *temporarily* requiring

---

[14] For instance, Mother argues the "best interests" standard should not be applied. However, this argument is egregiously misleading. KRS 403.320(3), as quoted herein, explicitly incorporates "the best interests of the child" within the statutory requirements. The case Mother cited for her supposition – *Hornback v. Hornback*, 636 S.W.2d 24, 26 (Ky. App 1982) – referenced a prior version of the statute, a statute that was modified at least four times since 1982 (2021, 2018, 2013, and relevantly in 1992).

[15] Mother also argues that the family court erred in allowing the child to continue seeing Dr. Izquierdo (November 15 Order) and quashing her subpoena for Dr. Izquierdo's medical records (October 10 Order), but those matters are not adjudicated within the orders on appeal, and therefore are not currently before this Court.

Mother's parenting time to be supervised in a clinical setting while the court garnered more information as to Mother's mental health – in order to protect the child. The family court determined unsupervised parenting time with Mother endangered seriously the child's mental, physical, and emotional health. Supporting this conclusion, the court noted that on the same day the court lifted supervision of the parents' parenting time, a significant incident occurred that gave the court grave concern for the child's mental health and Mother's ability to parent the child when he is in an emotional state. The court stated it needed additional information to understand why the child was demonstrating significant mental health issues while in Mother's care.

The family court heard testimony from Dr. Izquierdo's intern that, from her experience, the child most often arrived for therapy appointments (in the immediately preceding months) with Father, and on those occasions, she perceived the child as calm and joking with Father. The family court noted Dr. Izquierdo's testimony and the psychologist's concerns about Mother's ability to de-escalate the child's anger.[16] The court stated Mother's attempts to "villainize" Dr. Izquierdo were "contrary to what the Court heard in the recording or observed during Dr. Izquierdo's testimony." Referencing the audio recording provided by Mother, the

---

[16] Mother argued she personally calmed the child, but the court disagreed; it appears the family court believed that Dr. Izquierdo's words and the child's choice to exit the building likely had the calming effect.

court noted concern about Mother's conversation with the child as, to the court's impression, Mother's words were exacerbating the child's anger and Mother's actions "showed a clear lack of insight." Hence, the family court had cause to be concerned about child's mental health when the child was in the Mother's care, and requiring her parenting time be temporarily supervised was reasonable and in the best interests of the child.

### (i) The family court did not abuse its discretion by denying Mother's request to call Child as a witness.

On appeal, Mother argues the family court erred by not allowing the child to testify on November 25. We do not agree. "[T]he decision to permit a child to testify in a proceeding involving custody or visitation should be left to the sound discretion of the trial court." *Addison v. Addison*, 463 S.W.3d 755, 764 (Ky. 2015). In fact, "'[t]he elementary principles of humanitarianism are so strongly against the placing of a child between its parents that we feel a trial court should have a wide latitude in protecting the child.'" *Id.* (quoting *Parker v. Parker*, 467 S.W.2d 595, 597 (Ky. 1971)).

Prior to November 25, 2024, the family court was provided with almost *eight years* of testimony, pleadings, professional recommendations, and investigations revolving around this child and his veracity. The case had two parenting coordinators, an active GAL, and an FOC. The court heard testimony from the child's long-term psychologist and previously from the child himself.

-28-

The court heard a consistent pattern of the child making an accusation of abuse, that accusation not being substantiated, and the child altering his story. In the years leading up to November 25, numerous professionals – GAL, FOC, Dr. Izquierdo – were consistently stating their belief that the child was not in danger with Father, thus calling into question the child's veracity and motives. These same professionals repeatedly stated concern about the child's mental health and the toll this co-parenting situation was having upon him. The court determined it was not in the best interest of the child to yet again put him squarely between his parents in this destructive battle.

Further, KRE[17] 601(b) grants a trial court the power to disqualify a witness if it determines that witness:

> (1) Lacks the capacity to perceive accurately the matters about which he proposes to testify;
>
> (2) Lacks the capacity to recollect facts;
>
> (3) Lacks the capacity to express himself so as to be understood, either directly or through an interpreter; or
>
> (4) Lacks the capacity to understand the obligation of a witness to tell the truth.

Here, the family court spoke with the child in August, just months prior to the November 25 hearing. The court stated its concern as to whether the

---

[17] Kentucky Rule of Evidence.

child "even knows the truth at this point." The family court made sufficient, explicit findings that the child lacked competence, and the court reasonably expressed concern about Mother's constant, continued attempts to place the child in the middle of this parental battle.

We believe a 2008 Court of Appeals' holding is worth repeating:

> [W]e do not condemn but rather applaud the court for using its discretion to disallow testimony from two young children who were clearly traumatized by the enduring drama of their parents['] divorce. Furthermore, it appears that the GAL adequately advocated for his clients' best interests without subjecting them to yet another "expert" interview that is not required by law. The GAL and the court had the benefit of numerous opinions from experts as well as other witnesses to form their assessment of a then eight-year-old boy and five-year-old girl. Their young age and the pressure applied by Mother severely diminish, if not completely obscure, the value of their opinions or testimony. The continued pursuit by Mother to put her children directly in the "line of fire," only further proves the soundness of the family court's judgments.

*Addison*, 463 S.W.3d at 764 (quoting *C.T. v. F.T.*, No. 2007-CA-001452-ME, 2008 WL 5215939, at *5 (Ky. App. Dec. 12, 2008)). In the case *sub judice*, the family court judicially balanced Mother's request, with the family court's interest in protecting the child, and did not abuse its discretion by refusing to allow the child to testify on November 25.

**(ii)** **The family court did not commit reversible error in referencing the CAC interview or Cabinet report.**

Mother argues the family court did not have sufficient evidence to support its statement that "[t]here were no allegations [of abuse] at the CAC." (The interview that occurred immediately after the child disclosed abuse to the family court.) Mother asserts the family court "had no basis upon which to make any factual finding regarding what disclosures were – or were not – made during the CAC [I]nterview" because the subsequent Cabinet report and CAC interview itself were not admitted into evidence. However, we find that argument unpersuasive.

The statement that Mother takes umbrage with – "There were no allegations at the CAC[]" – does not appear in the November 25 Order.[18] Presumably, the statement was made by the family court during one of the hearings, but without a reference to the record in the appellate briefs, it is unclear which hearing and when it was stated by the family court. Hence, it is unclear how much reliance, if any, the family court placed on the CAC Interview. As stated above, the family court did not make its determination as to whether the child should testify solely on one report by the Cabinet, but rather utilized its broad

---

[18] The November 25 Order states, "the child has made conflicting statements to the Court, Cabinet, Therapist, and CAC." It is unclear if this is the statement Mother contests or if the quoted statement from Mother's brief was stated orally during one of the court's many hearings.

discretion to weigh the benefit of his testimony against the possible harm to the child.

Further, as Mother does not cite any case law or reference any Kentucky evidentiary rule within her argument, it is unclear how such a statement by the court was specifically procedurally improper. From our review of the record, it is clear how the family court became aware of the CAC Interview. At the October 10 case management conference, the parties and court *all* expressed an understanding that during the CAC Interview, the child had not made disclosures of abuse. Also at that hearing, Mother stated her intention of having the interview admitted "so everyone can see it" because "[i]t is relevant to this matter." At the October 14 hearing, Mother again stated her intention to admit the CAC interview and related Cabinet report into evidence, but it does not appear she so moved. However, the family court's October 14 Order stated, "CAC interview with minor child to be released to Campbell Family Court." And, Mother attached the Cabinet report of that CAC Interview to her January 10, 2025, motion (which was included in the record on appeal). That report stated, "There were no disclosures made that surround current or past physical discipline in either home. There were no disclosures made surrounding sexual abuse or any inappropriate touching/exposure to inappropriate things." Under these circumstances, we believe any minor evidentiary procedural error, if there was one, did not constitute reversible error.

### (iii) There is no reversible error related to the GAL's October 11 Emergency Motion or her advocacy.

Mother argues the November 25 Order should be vacated because (1) the GAL's October 11 Emergency Motion was procedurally improper; (2) the GAL improperly crossed the line from advocate into witness and/or an FOC; and (3) the GAL erroneously failed to meet with the child prior to filing her October 11 emergency motion.

Immediately prior to the GAL's October 11 Emergency Motion, *both* parents were limited to supervised parenting time. The day that supervision was lifted, the child had an extreme emotional episode at his court-appointed therapist's office. Mother appears to argue that that event would have gone unnoticed by the family court but for the GAL's motion. We do not agree. The family court stated repeatedly on the record that it was staying well-informed and present with the situation due to its concerns about the child's mental health and the parents' extreme inability to co-parent. At the time of the GAL's motion, Dr. Izquierdo, the FOC, and the newly appointed parent coordinator were all active in the case. The October 10 events were unlikely to go unnoticed by the family court, regardless of the GAL's motion, and KRS 403.320(3) does not require *a party* to move to modify parenting time; this statute allows the court to modify an order granting or denying visitation "whenever modification" would serve the best interest of the child.

Mother asserts the GAL motion violated KRS 403.340, but that statute addresses modification of a *custody* decree. The family court did not modify custody and did not treat the October 11 Emergency Motion as a motion to modify custody. Rather, the court limited the motion's scope, stated it was not allowing arguments on custody until it had more information, and continued the trial into the next year to allow for the evaluations and the new parenting coordinator's report.[19] The family court only granted the GAL's request for Mother's psychological evaluation and for her parenting time to be supervised temporarily.

Mother repeatedly refers to the GAL's motion as "unverified," because the GAL did not attach affidavits confirming her statements. Procedurally, the GAL's Emergency Motion included a "verification" that the statements contained therein were true and accurate to the best of her knowledge, that verification was signed by the GAL, and the GAL's signature was notarized. Further, KRS 403.350 requires affidavits with a motion for a temporary *custody* order or for modification of a *custody* decree. Again, the court explicitly reserved on custody, did not grant the GAL's motion for a custody modification, and did not treat the motion as one for a custody modification.

---

[19] Sadly, this appeal has prevented the matter from proceeding to a custody determination.

Mother argues the GAL's motion violated FCRPP 8, presumably FCRPP 8(2) requiring a motion to modify parenting time to "set forth facts supporting the requested modification and be verified *or* accompanied by an affidavit." Again, the GAL's October 11 Emergency Motion was verified, notarized, and narrowly tailored by the family court.[20]

In its November 25 Order, the family court found the GAL's motion was verified and stated sufficient grounds for injunctive relief pursuant to CR 65.04. CR 65.04 requires, in relevant part, a temporary injunction in which an action is pending be brought forth in a verified motion and in granting the request, the court set forth findings of fact and conclusions of law which constitute the grounds of its action. These procedural requirements were met. We find no error in the family court's conclusion that the GAL's motion did not violate CR 65.04.

Mother takes issue with the facts recited by the GAL in the motion that were presumably told to her by Dr. Izquierdo, but Dr. Izquierdo was called to testify, and Mother had ample opportunity to verify or attack the psychologist's statements. The family court's narrow tailoring of the GAL's October 11 Emergency Motion limited the prejudicial effect of any statements lacking

---

[20] Mother also argues the GAL's motion violated FCRPP 2(a). There is no FCRPP 2(a). FCRPP 2(1)(a) requires a verified petition in a dissolution action, but Mother is the petitioner, and this is not a dissolution action (the parties were never married). FCRPP 2(2) addresses venue, which is not at issue here. Mother might have been referring to FCRPP 2(8)(a), a rule that requires all *ex parte* motions in a dissolution action be verified *or* supported by an affidavit, but again, this was not a dissolution action; even extending the rule to this action, the GAL's motion was verified.

reinforcement through affidavits. Mother next argues that by "filing motions based on her observations, reports of fact and legal conclusions, the GAL blurred the line between advocate and fact-finder and made herself *de facto* Friend of the Court." To contextualize Mother's argument, we refer to the distinction between FOCs and GALs in the Commonwealth as described by our Supreme Court:

> Importantly, the guardian *ad litem* should not be confused with the *de facto* friend of the court. Whereas the friend of the court investigates, reports, and makes custodial recommendations on behalf of the court, and is subject to cross-examination, the guardian *ad litem* is a lawyer for the child, counseling the child and representing him or her in the course of proceedings by, among other things, engaging in discovery, in motion practice, and in presentation of the case at the final hearing. The guardian *ad litem* neither testifies (by filing a report or otherwise) nor is subject to cross-examination.

*Morgan v. Getter*, 441 S.W.3d 94, 119 (Ky. 2014).

Mother relies on *Morgan v. Getter* in arguing the GAL ceased acting as the child's legal counsel and "instead [became] a reporting source" subject to cross-examination. Mother asserts the family court erred by protecting the GAL from adversarial scrutiny, but we do not agree. To the contrary, the family court took proactive steps to protect both child *and* Mother.

The family court (1) narrowly tailored the GAL's motion to only raise issues of parenting time and a request for a psychological evaluation; (2) limited

-36-

the GAL's motion and Dr. Izquierdo's testimony to the events of October 10;[21] (3) did not allow arguments pertaining to any information beyond the immediate request for injunctive relief; and (4) allowed the GAL to zealously advocate for her client, a child who has been used as a pawn in parental war. "[E]ven assuming that children have an autonomy interest that can and should be advanced in custody proceedings, they also have an overriding interest in the court's protection that can only be served by allowing the GAL to make and to act upon an independent assessment of the child's 'best interest.'" *Id.* at 118. We find no reversible error in the family court's balancing act, the limitations placed upon the GAL's motion, nor its attempts to protect Mother's due process rights.

Mother argues the child did not wish his mother's parenting time to be limited or supervised and the GAL erred by not speaking with the child before filing the October 11 Emergency Motion. Yet, as stated clearly in *Morgan v.*

---

[21] Additionally, Mother argues her due process rights were violated when the family court denied her request to review Dr. Izquierdo's medical records, thereby preventing Mother from properly preparing for Dr. Izquierdo's testimony. However, Dr. Izquierdo was a fact witness as to what happened on October 10 when the child was having an emotional episode – as opposed to an expert witness – and the family court limited her testimony to only interactions that occurred that day. Dr. Izquierdo did not give an opinion as to the parties' mental health nor did she offer parenting time or custodial recommendations during her testimony. Mother argues, without case law, that the GAL elicited an expert opinion about a "core custody determination" by improperly asking Dr. Izquierdo about her "concerns" regarding the child staying with Mother in light of the events of October 10. However, as discussed, the family court reserved on custody and did not make any custodial determinations. In fact, the November 25 Order did not reference Dr. Izquierdo's "concerns," only the court's own concerns. As such, it is unclear how this question – assuming arguendo that it did elicit improper expert testimony – would address the question on appeal, *i.e.*, how the question/answer demonstrated the family court's parenting time modification was arbitrary, unreasonable, unfair, or unsupported by sound legal principles.

*Getter*, the GAL represents the child's best interest, not necessarily the child's wishes. *Id.* at 114. In fact, in custody situations, a GAL's good faith advocacy on behalf of the child's best interest is required "even if the child disagrees with the advocate." *Id.* at 116. Here, the GAL was no stranger to this child, this child's stated wants, and this child's relationship with Mother. The record establishes Mother's immense love for her child and the child's strong connection with her, but the family court, Father, GAL and FOC have all continually raised concerns about whether that relationship was wholly healthy.

Mother accuses the GAL of "unconscionable" behavior, failing to diligently perform her duties, and violating her professional rules of conduct by not meeting with the child, her client. Mother states in her appellate reply brief, "the GAL admitted she did not meet with the child" and cites to the October 10 Hearing. However, Mother's argument is misleading. The discussion during the October 11 hearing was that the GAL did not meet with the child *immediately prior to filing the October 11 Emergency Motion*, not that the GAL did not meet with the child *at all*, as Mother implies.

The record is clear that the GAL did meet with her client. We see no need to scour the record for every stated interaction, but as we have already discussed, the GAL met with the child after an accusation of abuse in December 2021, and the GAL was involved in the conversation the court had with the child in

chambers in August 2024. True, the GAL did not meet with the child on October 11, but that failure does not require a finding that the GAL did not meet her advocacy obligations. In her August 20, 2024 pleading, the GAL stated she had "advocated for the child's best interests by arguing on his behalf, she has filed pleadings, she has attended hearings, consulted the other parties and witnesses, and made arguments on the child's behalf both inside and outside of court." The GAL had been active in his case for years and had spoken with Dr. Izquierdo, representatives of the child's school, and of course, the child's parents.

Contrary to Mother's argument, arguing counter to the child's wishes but in his best interest *does not* put GALs at odds with their professional obligations. *See id.* at 116. "A properly trained GAL, in sum, who has thoroughly investigated the child's situation and consulted with the child, is not disqualified from advocating what he or she determines is the child's best interest merely because the child disagrees." *Id.* at 117. While we appreciate the lines separating GALs and FOCs as discussed in *Morgan v. Getter*, we also appreciate a GAL who strives to safeguard her minor client in highly contentious litigation.

> **(iv) The family court ordering Mother to undergo a comprehensive psychological assessment was statutorily permissible and reasonable.**

Mother appears to argue that the court order requiring her to complete a comprehensive psychological assessment and collateralized parenting assessment

is unreasonable, unnecessary, and duplicative. She asserts she "has no [mental health] conditions, no diagnoses, not in treatment, no meds" and "already completed a mental health assessment and parenting evaluation[.]" True, the November 25 Order was not the first time a mental health evaluation was *ordered* for Mother, but the record does not indicate she ever *completed* a comprehensive psychological assessment nor *provided* one to the family court.[22] Also, notably, Dr. Deters's 2019 Parenting Plan recommendation for 50/50 custody and 50/50 parenting time was conditioned upon compliance with treatment plans, plans that included individual parent therapy for both parents; it is unclear if Mother (or Father) is abiding by this condition.

Even more strangely, Mother states, "Dr. Feinberg submitted a report that Appellant/Mother had no clinical diagnoses" and refers us to Dr. Feinberg's Conference Summary. Yet, to imply the Conference Summary did not raise any concerns about Mother's mental health is inappropriate. When possible, we refrain

---

[22] In December 2021, Mother moved for an order compelling both parents to undergo a parenting evaluation. That same month, the family court orally and on the docket sheet ordered psychological evaluations for child, Mother, and Father. In January 2022, the parties agreed to undergo a custodial evaluation to be performed by Dr. Feinberg and the evaluation "shall include a psychological evaluation of all parties involved." In October 2022, Father moved for a court order requiring Mother to undergo a psychiatric evaluation. Our record on appeal includes Dr. Feinberg's Conference Summary, but not a comprehensive evaluation for Mother. The fact that the court re-ordered a psychological assessment indicates it did not have one or if it did, the evaluation was not comprehensive and/or current. As such, Mother has not established that the family court ordering comprehensive psychological assessment and collateralized parenting assessment is unreasonable, unnecessary, and/or duplicative.

from revealing sealed mental health assessments. However, due to Mother's argument, we are compelled to discuss Dr. Feinberg's Conference Summary in a limited capacity. The Conference Summary stated, in part, that (1) Mother appears to be chronically anxious and highly emotionally sensitive; (2) Mother directly and/or indirectly promotes a narrative that Father is a danger to the child; (3) Mother has poor emotional boundaries with the child; (4) Mother has created an environment where the child feels compelled to mimic her dislike of Father; (5) Mother's lack of structure and discipline is a hinderance to the child; (6) Mother does not shelter the child from her intensely negative feelings about Father; (7) Mother has an inability to de-escalate the child's anger; (8) Mother allowed her mother to "interfere in the parenting" of the child; and (9) Mother does not fully support the child's academic success by allowing him to be truant.[23]

Throughout Mother's appellate briefs, she uses inflammatory language to argue the family court undermined the safety of the child and "forced [Mother] to choose between protecting her child and complying with expectations imposed without due process[.]" Mother argues she must "concede instability or remain restricted[.]" We perceive no such conundrum. The family court had valid

_____

[23] The child's truancy *during Mother's parenting time* has been an ongoing concern to such a degree that the family court entered an order stating that if a parent believes the child is too sick to attend school, that parent must bring the child to school and the school principal will decide if the child is too sick to stay. Dr. Feinberg stated, "[Child] has missed far too many days of school during [Mother's] timesharing."

concerns for the child's mental health, Mother's mental health, and Mother's ability to parent the child through his struggles. To protect the child, the court ordered Mother's mental health evaluation prior to determining custody and required her parenting time be supervised in a clinical setting until the court was reassured that Mother was not exacerbating the child's struggles. This is not unreasonable. In fact, it is explicitly statutorily permitted. According to FCRPP 6, if there are disputes regarding custody, parenting time, or support, the court may order a custody evaluation and/or psychological evaluation of a parent and/or child. FCRPP 6(2)(a), (b). To do so was statutorily permitted, and under these circumstances, reasonable.

### (v) Mother failed to meet her burden on appeal.

Ultimately, Mother did not meet her burden of establishing the family court (1) relied upon clearly erroneous factual findings; (2) abused its discretion in temporarily modifying parenting time; or (3) made an error of law warranting reversal. Clearly, the family court's decision to have Mother's parenting time supervised pending a mental health evaluation was not arbitrary, unreasonable, unfair, or unsupported by sound legal principles. We find no abuse of discretion in the Campbell Family Court order modifying Mother's parenting time and ordering a comprehensive psychological assessment and collateralized parenting assessment. Thus, we AFFIRM the family court's November 25 Order. In doing

-42-

so, we repeat the words of the original family court judge presiding over this action, Judge Woeste: ***everyone*** involved needs to "<u>take it down a notch</u>." For the sake of the child, the goal is amity, not enmity.

### B. November 26 Order

Finally, we must address the November 26 Order instructing Mother to pay GAL fees. A GAL is entitled to a "reasonable fee for [her] services." KRS 387.305(4). "An award of attorneys' fees is within the sound discretion of the trial court and will not be disturbed '[a]bsent a showing of an abuse of that discretion.'" *Superior Steel, Inc. v. Ascent at Roebling's Bridge, LLC*, 540 S.W.3d 770, 787 (Ky. 2017) (quoting *Woodall v. Grange Mut. Cas. Co.*, 648 S.W.2d 871, 873 (Ky. 1983)). [24] "The amount of an award of attorney's fees is committed to the sound discretion of the trial court *with good reason*. That court is in the best position to observe conduct and tactics which waste the court's and attorneys' time and must be given wide latitude to sanction or discourage such conduct." *Gentry v. Gentry*, 798 S.W.2d 928, 938 (Ky. 1990) (emphasis added). "An appeal can be taken from the award of a guardian *ad litem* fee in order to review the amount and reasonableness of the fee." *James v. Shadoan*, 58 S.W.3d 884, 886 (Ky. 2001)

---

[24] On appeal, Mother states, that without case law, the reasonableness of GAL fees is a "question of fact and law[,]" and the GAL fees "may be reduced or waived if the attorney violates rules regarding diligence and keeping the client informed." As Mother's brief did not include a citation with those statements, it is unclear upon what precedent she is basing that argument.

(citations omitted). Here, the November 26 Order did not include a finding that the GAL's fees and the assignment of those fees to Mother was reasonable. **Thus, we VACATE the November 26 Order and REMAND for additional findings as to reasonableness**.

## CONCLUSION

Accordingly, we AFFIRM the family court's November 25 Order requiring Mother's parenting time to be temporarily supervised in a clinical setting and ordering Mother to undergo a comprehensive psychological assessment and collateralized parenting assessment.

However, we VACATE the family court's November 26 Order requiring Mother to pay GAL fees and REMAND for additional findings as to the reasonableness of those fees and the assignment of those fees to Mother.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Amy E. Halbrook
Jennifer L. Conner
Crestview Hills, Kentucky

BRIEF FOR APPELLEE:

J. Richard Scott
Covington, Kentucky